1        **UNITED STATES DISTRICT COURT**
         **WESTERN DISTRICT OF NEW YORK**
2

3    _____

     UNITED STATES OF AMERICA,
4                                        Case No. 1:20-cr-191
                    Plaintiff,                        (LJV)
5
     vs.                                 October 27, 2021
6
     JUAN C. PADUA,
7
                    Defendant.
8    _____

9

            **TRANSCRIPT OF STATUS CONFERENCE**
10    **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
            **UNITED STATES DISTRICT JUDGE**
11

12   APPEARANCES:          TRINI E. ROSS, UNITED STATES ATTORNEY
                           BY: CHARLES E. WATKINS, ESQ.
13                             PIERRE RICHARD ANTOINE, ESQ.
                           Assistant United States Attorneys
14                         Federal Centre
                           138 Delaware Avenue
15                         Buffalo, New York 14202
                           For the Plaintiff
16
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
17                         BY: FONDA DAWN KUBIAK, ESQ.
                               CARLA J. BENZ, ESQ.
18                         Assistant Federal Public Defenders
                           300 Pearl Street
19                         Suite 200
                           Buffalo, New York 14202
20                         For the Defendant

21   PRESENT:              APRIL KELLY, Paralegal

22   DEPUTY CLERK:         COLLEEN M. DEMMA

23   COURT REPORTER:       ANN M. SAWYER, FCRR, RPR, CRR,
                           NYRCR, NYACR, Notary Public
24                         Robert H. Jackson Courthouse
                           2 Niagara Square
25                         Buffalo, New York 14202
                           Ann_Sawyer@nywd.uscourts.gov

```
 1              (Proceedings commenced at 9:31 a.m.)

 2         THE CLERK:  All rise.  United States District Court

 3    for the Western District of New York is now in session, the

 4    Honorable Lawrence J. Vilardo presiding.

 5         THE COURT:  Please be seated.

 6         THE CLERK:  20-CR-191, United States of America

 7    versus Juan Padua.

 8         Assistant United States Attorneys Charles Watkins and

 9    Pierre Richard Antoine, and paralegal April Kelly appearing on

10    behalf of the government.

11         Assistant Federal Public Defenders of course of

12    course and can be can be appearing with defendant.  Defendant

13    is present.

14         This is the date set for a status conference.

15         THE COURT:  Okay.  Good morning, everybody.

16         ALL PARTIES:  Good morning, Your Honor.

17         THE COURT:  So, a couple things.  Let's do the expert

18    disclosure issue first.

19         What is wrong with the government's expert disclosure

20    with respect to the testimony on, hang on, 1 kilogram of

21    cocaine in brick form consistent with distribution and

22    inconsistent with personal use, and that such a quantity

23    wholesale would sell for approximately 40- to $50,000.

24         MS. KUBIAK:  Judge, they give a very vague

25    description with respect to his experience with respect to
```

 1    that.  The bottom line is that he's an FBI agent, period.  I

 2    don't know what cases --

 3              THE COURT:  Well, no, no, no, no.  He's an FBI agent

 4    who received his training where he received his training.

 5    He's participated in hundreds of investigations.  He's

 6    familiar with the means and methods of trafficking cocaine

 7    from Puerto Rico to Buffalo.  He, I mean, what more are they

 8    supposed to tell you?

 9              MS. KUBIAK:  Judge, how do you know that, just

10    because they're saying it?

11              I don't know what cases he worked on.  I don't know

12    where he was stationed, what he was doing.  We don't have any

13    complete statement of the opinions he's going to provide so

14    that I can cross-examine him.  I don't know when he went and

15    received this training at the FBI Academy.  I don't know the

16    basis for his opinions.  I don't know what cases he worked on

17    to formulate those opinions.  I don't know who he talked to to

18    formulate those opinions.

19              It's -- it's basic -- at this point, it would be any

20    law enforcement officer anywhere becomes an expert witness.

21    So, without -- if they would give me a CV, then I could

22    understand that, I could cross-examine him.  He worked on this

23    particular case, or you were, you know, working on package

24    cases being distributed between Puerto Rico and Buffalo for

25    the past ten years.

1        I don't even have that, Judge.  And just -- it's

2   general knowledge, and I don't think that's sufficient to make

3   him an expert.

4        So if I had even the faintest information with

5   respect to what his work was involving, I mean, that's the

6   problem.  A CV would change this.  Training records would

7   change this.

8        And I think it's interesting, Judge, that -- he's an

9   FBI agent, so I can't subpoena his training records.  I can't

10  get his personnel file because of Touhy.  If this was a

11  detective in Amherst, I could subpoena his information.

12       So, I'm at a -- the defense is at a complete

13  disadvantage to be able to cross-examine him because I'm stuck

14  with his answer, Judge.  I don't know.

15       If he tells me, you know, he worked 57 package cases

16  involving packages back and forth from Puerto Rico, I don't

17  know that, I can't impeach his credibility, I have no

18  information on that, and we're stuck with that.

19            THE COURT:  Okay.  Why --

20            MS. KUBIAK:  So that's why I think the disclosure is

21  insufficient and needs to be more substantial.

22            THE COURT:  Why can't you give her a CV?

23            MR. ANTOINE:  Your Honor, first of all, the agent

24  doesn't have a CV.  In fact, I'm not aware of any FBI agents

25  who walk around with CVs in their pockets, it just doesn't

1  exist.

2          And, secondly, what counsel is asking for goes above

3  and beyond every other case that I've cited in our filings

4  where the 2nd Circuit said the disclosures were enough and

5  sufficient.  And what we've disclosed is consistent with all

6  of these other cases where the 2nd Circuit had said the

7  disclosures were sufficient.

8          We described how long he's been working in the field.

9  We described his experience.  We describe where he gained that

10  experience.  We described the basis for his opinion.  And we

11  described what opinion he's going to give.

12          THE COURT:  Yeah, I --

13          MR. ANTOINE:  The 2nd Circuit has said that's

14  sufficient.

15          THE COURT:  I do think that's good enough.  I do

16  think that's good enough.

17          Now, but now let's talk about the next I issue, and

18  that is whether he can testify about this coded language.

19  That's not in your disclosure.

20          MR. ANTOINE:  What's in our disclosure, Judge, is

21  that he's gonna be -- yes, it is in our disclosures, that he's

22  going to be testifying to coded language --

23          THE COURT:  No, it's not.  It's not in your

24  disclosure.

25          MR. ANTOINE:  It's --

1          THE COURT:  The disclosure says -- the government's

2     expert disclosure says he will provide expert testimony to

3     explain to the jury that 1 kilogram of cocaine in brick form

4     as shipped from Puerto Rico is consent with distribution and

5     inconsistent with personal use.  Such a quantity wholesale

6     would sell for approximately $40,000 to $50,000 in Buffalo.

7     Period.  That's the end of your expert disclosure.

8          MR. ANTOINE:  Your Honor, that's docket 67.  In

9     docket 88, we filed a response to counsel who specifically

10    asked about coded language, we described exactly what the

11    disclosure is going to be, and we described the basis for that

12    disclosure and --

13         THE COURT:  That's your response to their motion to

14    exclude.

15         MR. ANTOINE:  Yes, Your Honor.  We provided our

16    disclosures in that, as well as docket 98.

17         THE COURT:  Do you want to be heard on that?

18         MS. KUBIAK:  Yeah.  Judge, I mean, this is the

19    problem we have.  We have a disclosure and an obligation under

20    the rules under the Court's order.  We rely on that.

21         Then they, again, late disclose additional

22    information, and then give another vague description that, oh,

23    now he's also going to testify with respect to this.

24         And it's the same argument I made previously about

25    what's his training, what's his experience, what is the basis

1  of his opinions that he's now going to render, what specific

2  qualifications does he have with respect to that, what

3  publications has he authored or reviewed with respect to

4  coming to that opinion --

5         THE COURT:  No, I understand, I've already ruled on

6  the first point.

7         MS. KUBIAK:  And I think because --

8         THE COURT:  I'm going to let him testify -- I'm going

9  to let him testify what was in your expert disclosure and

10  that's it.

11         MR. ANTOINE:  Your Honor, may I?

12         THE COURT:  You may.

13         MR. ANTOINE:  At the time docket 67 was filed, we did

14  not have the language that was used by the defendant, his text

15  message to his coconspirator.  So at the time the initial

16  disclosure was done --

17         THE COURT:  That came --

18         MR. ANTOINE:  -- we didn't have --

19         THE COURT:  -- from -- that came from --

20         MR. ANTOINE:  That came from his phone.

21         THE COURT:  Not the defendant's phone, from the other

22  phone?

23         MR. ANTOINE:  That's correct.

24         And then once we got that, that was updated.  If you

25  look at docket 88 and docket 98, it is spelled out exactly

```
 1   what the coded language --

 2          THE COURT:  And you did not have it when you filed --

 3          MR. ANTOINE:  That's correct.

 4          THE COURT:  -- docket 67?

 5          MR. ANTOINE:  That's correct, we did not.  We had not

 6   yet gotten into the coconspirator's phone.

 7          MS. KUBIAK:  Judge, I think they got into the

 8   coconspirator's phone in July of 2021.

 9          MS. BENZ:  They got into the phone July 18th --

10          MR. ANTOINE:  That's not true, Your Honor.

11          MS. BENZ:  -- 2021.

12          MS. KUBIAK:  That's the date of their Cellebrite

13   extraction.

14          MS. BENZ:  The date of the Cellebrite extraction.

15          THE COURT:  Hang on.  One at a time.

16          MR. ANTOINE:  That's not correct, Your Honor.

17          We -- we -- we -- we -- we submitted the language

18   that Mr. Padua had used in his text message to his

19   coconspirator recently, actually, once we were able to get

20   into -- once we were able to get into the -- the -- the phone,

21   of the coconspirator's phone.

22          THE COURT:  Why do you think they got into the phone

23   in July?

24          MS. KUBIAK:  Because we have the Cellebrite report,

25   Judge.
```

1          MS. BENZ:  I know for a fact they got into the

2    expert -- the -- Michael Vasquez's cell phone, the cell phone

3    extraction report from Virginia, DEA lab in Virginia, is dated

4    July 18th, 2021.  It wasn't turned over to defense until

5    September, but the government certainly had that cell phone

6    extraction report in their possession for two months prior to

7    filing that expert disclosure.

8          I can't pull it up on my computer right now,

9    Your Honor, but I can after court once I have access to the

10   internet, I can pull up the extraction report.

11         THE COURT:  Is that -- is that accurate?

12         MR. WATKINS:  Judge, if I may?

13         THE COURT:  Yep.

14         MR. WATKINS:  We disclosed it to defense in

15   September, because I don't know if the Court remembers, we

16   litigated this issue, because you asked me about the due

17   diligence --

18         THE COURT:  I remember vividly.  I remember vividly.

19         MR. WATKINS:  So --

20         THE COURT:  But I just had a representation made to

21   me that the government didn't have this until after

22   September 13th, 2021, and the defense is telling me that the

23   government had it in July.

24         MR. WATKINS:  If -- if the defense is saying the

25   government, in the grand text like the Court -- the Court told

 1  us the last time we litigated this issue, as in the DEA, as in

 2  the DEA lab, as in all of these things, then, yes, the DEA

 3  apparently got into the phone in July.  It was -- the -- the

 4  report was not produced to us until September when we produced

 5  it to the defense.

 6          And I cannot answer for why the report wasn't

 7  produced to us, only other than the fact that it wasn't

 8  downloaded and it wasn't produced.

 9          MS. BENZ:  And, Your Honor --

10          MR. WATKINS:  But I can say --

11          MS. BENZ:  Sorry.

12          MR. WATKINS:  But I can say that when the government

13  found out about the coded language used in the extraction is

14  when we started talking about our FBI agent testifying about

15  the use of coded language in drug conspiracies.

16          This is not an attempt to hide any evidence, this is

17  not an attempt to mislead the defense, this is not an attempt

18  to prejudice them.  This is what we had and when we turned it

19  over, Judge.

20          THE COURT:  I understand that, but there's something

21  very troubling about the government -- and I don't mean the

22  U.S. Attorney's Office, I mean the government -- having this

23  in July, a trial's scheduled for October, and the -- and your

24  office and the defense getting it in September.  There's

25  something troubling about that.

1          And the fact that your office gets it in September, I

2    mean, that's one thing.  But the defense is entitled to this.

3    And the government, capital G, had it in July.

4          MR. WATKINS:  Well --

5          THE COURT:  There's something very troubling.  You

6    don't see -- you don't see what I'm seeing?  That being

7    troubling?

8          MS. KUBIAK:  And, Judge, this is -- this is what

9    we've been arguing about.  So this isn't about the

10   prosecutors, this is about the government, the agents, the

11   DEA, and how we have been prejudiced by it.  And it's been

12   pervasive throughout.

13         And so they have it.  It doesn't mean, hey, we have

14   it, let's do nothing with it.

15         They have an obligation, the agents, to communicate

16   with their counsel and do something.  And this is what's

17   happened throughout, and that's why we're arguing it because

18   it is prejudicial to us.

19         And it's the same argument that Ms. Benz is going to

20   make soon about what has happened throughout the course of

21   this.

22         And so even if they had it in July, it doesn't get

23   turned over to us until after we have the submission deadline.

24         MR. ANTOINE:  Your Honor, counsel received the

25   Cellebrite report as soon as we got it.

```
 1              THE COURT:  I understand that.  I get that.  I'm not
 2    blaming you, so --
 3              MR. ANTOINE:  I understand, Your Honor.  And they got
 4    it as soon as they got it.  And it's -- and it's one text
 5    message, the food is here.  And as soon as we got that, we
 6    turned it over to them and explained that we're going to have
 7    an expert witness come in and testify to the meaning of that
 8    code.
 9              It's our position that it's not -- it's not
10    prejudicial to counsel at all.  And, again, we briefed it in
11    not just one filing, but at least two.
12              And so they've been made well aware now, Judge, for
13    quite some time.  I don't believe it's prejudicial to them in
14    any way.
15              THE COURT:  Yeah, tell me how --
16              MS. BENZ:  Your Honor --
17              THE COURT:  -- tell me how it's prejudicial.
18              MS. BENZ:  -- let me just say this.  I think the
19    point is that the government was into this phone and had
20    access to it July 18th.
21              They filed their expert disclosure September 13th.
22              Now, I'm not telling anybody how to do their job,
23    because I certainly make my own mistakes.  But if I'm about to
24    file my expert disclosure, I want to know what my evidence is
25    that my expert is going to be testifying about.
```

1          They know, before they file that expert disclosure,

2     that their expert has gotten into the phone, yet they proceed

3     with filing that disclosure, potentially without ever

4     reviewing the contents of the extraction that they have

5     available to them.

6          THE COURT:  Okay.  Answer my question now, please.

7          How is this prejudicial to you?  He's right when he

8     says it's one statement on the cell phone.  How is it -- how

9     is that prejudicial to you?  If you got it in July, you get in

10    September, what's the big deal?

11         MS. BENZ:  Your Honor, in all candor to the Court,

12    it's the worst fact of the entire case.  We're prepping for

13    months for this case, telling our client he should be going to

14    trial and rejecting an offer because they have a single

15    package being delivered on one day.  They have nothing else in

16    the entire case.  We're prepping.  We have openings.  We have

17    a demonstrative for closing ready to go.  It is prejudicial

18    because --

19         THE COURT:  No, no, no, that's not telling -- that's

20    telling me how you were inconvenienced, it's not telling me

21    how you're prejudiced by it.

22         What would have changed if you learned this in July

23    as opposed to September?

24         MS. BENZ:  Our entire trial strategy and

25    investigation, and potentially telling our client maybe we

1   need to reevaluate what we're doing here --

2           THE COURT:  But you could --

3           MS. BENZ:  -- and now --

4           THE COURT:  -- do that -- but you could do that in

5   the month in between.  I mean, things happen.  You can do that

6   in the month in between.  I don't understand what the

7   difference is.

8           I understand that you may have had to do additional

9   work to change your trial strategy.  I understand it may

10  change the calculus with respect to accepting a plea offer or

11  not.  But all those things can happen in a month, a month and

12  a half now.

13          Why -- why is it prejudicial to you?  What -- what

14  could you have done that you didn't do if you had it in July

15  as opposed to September?  If you had three and a half months

16  instead of a month and a half?

17          MS. KUBIAK:  We might have been able to get an

18  additional expert, we don't know.  Again, we don't even know

19  what his qualifications are --

20          THE COURT:  Okay.

21          MS. KUBIAK:  -- to opine that this is a code and it's

22  one word, and they say it's just one word.  Well, then if it's

23  just one word, and it's the word "food," then they don't need

24  an expert to opine to the jury what it means.  It's one word.

25          And so, you know, I don't know what training Mr. --

1    Agent Winters received to make that determination, that that

2    particular word means drugs, or is coded at all.  I have no

3    ability to confront the witness --

4              THE COURT:  Well, he's not going to say that --

5              MS. KUBIAK:  -- on a Crawford issue.

6              THE COURT:  -- he can't say that the word means

7    drugs.  He can say that --

8              MS. KUBIAK:  I think that's what he's gonna say.

9              THE COURT:  Well, I don't think that's what he's

10   gonna say.

11             MS. BENZ:  That's their plan, Your Honor.

12             MR. WATKINS:  Judge, Judge, the plan is for us to ask

13   Special Agent Winters, and I'll represent this to the Court

14   right now and we can have a transcript of it, the plan is for

15   Special Agent Winters to testify that coded language is used

16   during -- between coconspirators in drug conspiracies.

17             THE COURT:  Right.

18             MR. ANTOINE:  Well --

19             THE COURT:  He can't testify that this word means

20   drugs.

21             MR. ANTOINE:  Just to clarify, Judge, I've spoken

22   with Special Agent Winters personally, and he told me that he

23   has, based on his experience, he has heard that particular

24   word used in the context of drugs before.

25             THE COURT:  In other words, as well used for drugs.

```
 1    Food -- food is not a word that equates to drugs --

 2              MR. ANTOINE:  No, but --

 3              THE COURT:  -- any more --

 4              MR. ANTOINE:  -- no, no --

 5              THE COURT:  -- than stuff is, or --

 6              MR. ANTOINE:  Right, but he -- no, no, he has used --

 7    he has heard this particular word, food, used by drug dealers

 8    in the past when they're referring to drugs.

 9              MR. WATKINS:  Right.

10              THE COURT:  Okay.

11              MS. KUBIAK:  Therein lies the problem.

12              THE COURT:  I'm gonna allow -- I'm gonna allow the

13    government -- I'm gonna allow the government's late disclosure

14    on this.  I'm troubled by it, but I'm going to allow the

15    government's late disclosure on this.

16              Let's now talk about the defendant's cell phone,

17    which is quite a bit more troubling.

18              The government had the ability to get into this phone

19    when the defendant made his statement to the police, and yet

20    the government didn't get into the -- I mean, he gave you the

21    password, whatever you call it, pass code to get into the

22    phone.

23              MR. WATKINS:  Judge, I don't think it's as simple as

24    that.

25              THE COURT:  It's not?
```

USA v Juan Padua - Status Conference - 10/27/21            17

1              MR. WATKINS:  Because in the conversation, the -- the

2    portions that defense counsel summarized in their -- in their

3    filing leaves out some context.

4              And the context is they're arguing with the

5    defendant.  The defendant says bring me my phone.  He's like,

6    well, give me the code to your phone.  He says that, he yells

7    out that code.

8              So then special agent says, all right, I'm gonna look

9    in your phone.  And then he says, well, you don't have my

10   code.

11             And he's, like, well, is there another code?

12             You gotta look into my bank account, I told you I

13   have $8,000.

14             THE COURT:  Hang on.  Hang on.

15             Is the code that he gave you or that he gave the

16   officers the code to the phone?

17             MR. WATKINS:  We -- we have now found out that it is.

18             THE COURT:  Okay.

19             MR. WATKINS:  Yes.

20             THE COURT:  And you didn't try it for a year and a

21   half?

22             MR. WATKINS:  Well, Judge, again, here's the issue,

23   Judge.

24             THE DEFENDANT:  He's lying.  It's a lie.

25             MS. BENZ:  Stop.  Stop, please.

USA v Juan Padua - Status Conference - 10/27/21                18

 1                THE DEFENDANT:  Sorry.

 2                THE COURT:  Go ahead.

 3                MR. WATKINS:  Judge, I understand your -- I

 4   understand why you're troubled by this, I do.  I respect the

 5   Court's position on this.  I respect defense's position on

 6   this.

 7                But the fact of the matter is we went through the

 8   process that we normally use in the course of our

 9   investigations --

10                THE COURT:  But -- but --

11                MR. WATKINS:  -- to try to get into the phone.

12                THE COURT:  -- but do you normally have a defendant

13   say the code to the phone is 63712, and you just say, well, I

14   don't think that that's -- I mean, I have reason to believe

15   that that's not it, because he also said you don't have my

16   code?

17                MR. WATKINS:  Well, it's not just that, Your Honor.

18   But there are multiple issues here.

19                So, in Smartphones, there's a -- there's a way to

20   turn on a mechanism that erases your Smartphone after failed

21   login attempts.  And if it is the right code, we get into the

22   phone.

23                THE COURT:  Right.

24                MR. WATKINS:  Right?  If it's not the right code,

25   maybe it erases the phone.

1          THE COURT:  One -- one false attempt?

2          MR. WATKINS:  No, no, that's not what I'm saying,

3    Judge, but maybe.  And -- and --

4          THE COURT:  I just had this happen to me.  I just had

5    this happen to me a couple weeks ago.  I forgot my -- I forgot

6    what code I had on my iPad, and I hadn't used my iPad in a

7    long while, and I plugged in a code, and it wasn't the code.

8          So I said, okay, that's not it, it's a different one.

9    I tried a different one, that wasn't it.  And I tried a third,

10   and that wasn't it.  And I tried five times, and then it said,

11   okay, you're locked out for five minutes.

12         And then I thought, oh, heck, it's not one of those

13   five, it's got to be something else.  So after five minutes, I

14   tried again.  And then it said, okay, now you're locked out

15   for an hour.

16         And I tried again, and then was locked out for a day,

17   and then eventually I was locked out completely, but I tried,

18   like, ten times.

19         And then I had to give it to the IT people.  And they

20   said, Judge, why are you doing what you're doing?  You should

21   have given it to us six attempts ago.

22         So explain to me why an IT person who has this, and

23   has what the defendant says is his code, doesn't at least try

24   plugging in the code?  I mean, and it's a relatively simple

25   code.  It's -- what the defendant tells you is -- is that it's

```
 1    a -- hang on.

 2             THE DEFENDANT:  LO824.

 3             MS. BENZ:  LO824.

 4             THE COURT:  Yeah, LO824.

 5             So maybe it's L-oh-824, or it's L-zero-824.  Those

 6    are two tries.  Those are two tries.

 7             And maybe it's capital O or lower case O.  So, that's

 8    three tries.  So you can make those three tries and not hurt

 9    that phone.

10             I don't understand for the life of me why you

11    wouldn't try that, and why the defense has to wait until --

12             How many days before trial?

13             MS. BENZ:  October 18th.  The morning of

14    October 18th, 2021 is when we have reason to believe they

15    tried the code.

16             MS. KUBIAK:  Less than a week.

17             THE COURT:  I mean, that's -- that's, come on, that's

18    beyond the pale.

19             MR. WATKINS:  Here's the other side of this, Judge.

20    The other side to this is really simple.

21             They had no reason to believe this individual.

22             THE COURT:  Say it again?

23             MR. WATKINS:  They had no reason to believe this

24    defendant, that that was the code to his phone.  No reason.

25    So we go about --
```

1          THE COURT:  What do you mean, they had no reason

2    to -- why would they have no reason to believe it?

3          MR. WATKINS:  Because he was not truthful with them

4    for the entirety of the interview.  That's why we're here.

5    That's why we're trying this case.  That's why he was charged.

6          MS. KUBIAK:  Judge --

7          MR. WATKINS:  There's no --

8          THE COURT:  But --

9          MR. WATKINS:  Judge, may I?

10         THE COURT:  It turned out to be --

11         MS. KUBIAK:  It's the truth.

12         THE COURT:  I'm still not understanding why you

13   wouldn't at least give it a shot.

14         MR. WATKINS:  But --

15         THE COURT:  Why that's -- why that's unreasonable to

16   at least give it -- I look at it, and I say there are three

17   possibilities: that could be a zero, it could be a capital O,

18   or it could be a lower case O.  So that's three tries.

19         MS. BENZ:  Judge, can I answer that question for you?

20         THE COURT:  No, no, just let me finish first, and

21   then I want to hear from the government, and then I'll give

22   you a chance to talk.

23         There's three possibilities.  I'm not an IT guy, I'm

24   the opposite end of that spectrum.  But I know that if I'm

25   doing the investigation in this case, I'm going to at least

1   give that a shot.

2          MR. WATKINS:  Judge.  So, for the example that you

3   gave about your iPad.  Right?  And I take that example.  The

4   difference between your iPad and this phone is there's no

5   potential for incriminating evidence on your iPad.  Your iPad

6   is not a part of a drug investigation.  There's no potential

7   for you to give us a code that would erase your phone before

8   we got into it because you are not involved in --

9          THE COURT:  But explain to me how it would erase the

10  phone.  Explain that to me.  If you plug a code in, it erases

11  the phone?

12         MR. WATKINS:  It's -- there's -- it's possible to

13  have a worm installed on your phone so that when you put a

14  code in, it erases the phone.  It is possible.

15         MR. ANTOINE:  Judge, there's something else that --

16         THE COURT:  So why did you try it when you tried it?

17         MR. ANTOINE:  Well, Judge, yeah, can I just chime in

18  on this?  There's something that's been overlooked here.

19         As my cocounsel just stated, what was represented in

20  defense filing as the colloquy, the conversation between the

21  defendant and the agents, is not exactly the way that it went.

22  I'm not sure if the Court had an opportunity to watch it, but

23  here's how it happened.

24         THE COURT:  I did watch it.

25         MR. ANTOINE:  Here's -- right.  So this is being

1    talked about in the context of his bank account.  And at this

2    point, the agents are not certain what this code is for.

3         And so the best course of action that they chose is

4    to submit it to the lab to an expert, to a professional, who

5    knows how to extract information out of a phone.

6         They plug it into a system to try and Bruteforce it.

7    And that's what they've been trying to do, as opposed to

8    trying a code that, A, they don't know what it's for, they

9    think it might be in the context of his bank account, they're

10   not sure.

11        It wasn't until -- and, by the way, Judge, I watched

12   that video, that -- that -- that video myself, cocounsel

13   watched it, several of us watched it.  We weren't certain,

14   either, not just the agents, we weren't certain either that

15   this code was for the phone.

16        THE COURT:  He says okay -- okay --

17        MR. ANTOINE:  It wasn't until --

18        THE COURT:  -- hang on -- okay, bring the phone, I'll

19   give you the code.  It's LO824.

20        MR. ANTOINE:  That's --

21        THE COURT:  Okay.  Bring the phone, I'll give you the

22   code.  It's LO824.

23        MR. ANTOINE:  Your Honor, what are you reading from?

24        THE COURT:  I'm sorry?

25        MR. ANTOINE:  I'm sorry, what are you reading from?

USA v Juan Padua - Status Conference - 10/27/21

24

```
 1              THE COURT:  I'm reading from the defense submission.

 2              MS. KUBIAK:  Judge, we have the clip, let's play it.

 3              MR. ANTOINE:  So the defense submission -- so the

 4    defense submission, Judge, is not crystal clear as to --

 5              THE COURT:  That's not what he says?

 6              MR. WATKINS:  That's not verbatim what he said.

 7              MS. KUBIAK:  Let's play the video, we have it.

 8              THE COURT:  Let's play the video right now.

 9              MS. BENZ:  Let's play it.

10              (Simultaneous talking.)

11              MR. ANTOINE:  Judge, I wasn't finished yet.  I wasn't

12    finished yet.  I wasn't finished yet.  I was about to just

13    complete my thought, please.

14              THE COURT:  Go ahead.

15              MS. BENZ:  That's exactly what he said.

16              MR. ANTOINE:  I watched it, cocounsel watched it,

17    several of us watched it.  We weren't certain what the code

18    was for even though he said it, he was talking about a phone

19    and he was talking about a bank account.

20              THE COURT:  Okay, I want to watch it.

21              MR. ANTOINE:  It wasn't until, Judge, that we --

22              MS. BENZ:  How about the agents?

23              MR. ANTOINE:  Excuse me.

24              THE COURT:  Stop, stop, stop, stop, stop.

25              (Simultaneous talking.)
```

 1            MR. ANTOINE:  Excuse me.

 2            THE COURT:  Stop.

 3            MR. ANTOINE:  May I finish?

 4            THE COURT:  One at a time.

 5            MR. ANTOINE:  Judge, it wasn't until the expert at

 6    the lab came back to us and said we're not able to get into

 7    this phone because it is an alpha numeric code.

 8            That's when it rang the bell that, wait a minute,

 9    this code that he's shouting in the video, that must be what

10    the code is, and that's when we tried it for the first time.

11            THE COURT:  Okay.  Let me see it.

12            MS. KUBIAK:  And then, Judge, we would just like to

13    be heard on that last part of what happened when they did try

14    the code.

15            (Video was played.)

16            THE COURT:  Okay.  Stop.

17            If you want me to look at the phone, give me the

18    code.

19            So he says, I'm reading here, it's the exact same

20    thing I just heard.

21            MR. ANTOINE:  That's out --

22            THE COURT:  Stop.

23            MR. ANTOINE:  -- of context.

24            THE COURT:  Stop.  Stop, while I'm talking.

25            MR. ANTOINE:  Sorry about that.

1          THE COURT:  I told you, I'm not -- I'm not gonna do

2  that with you.  If you want me to look in your phone, give me

3  your code number.

4          Okay.  Bring the phone, I'll give you the code.  It's

5  LO824.

6          That's exactly what was said.  Now tell me, what is

7  ambiguous about that?

8          MR. WATKINS:  The very next -- the very next part of

9  that video, Judge.

10         They say, okay, I'm gonna look in your phone.

11         And the defendant says, well, you don't have my pass

12  code.

13         And he says, oh, wait, there's another pass code?

14         Yeah, my Chime account.

15         So that --

16         THE COURT:  My -- my -- what?

17         MR. WATKINS:  Exactly.  My Chime account.

18         THE COURT:  My Chime account?

19         MR. WATKINS:  That's when it becomes ambiguous to

20  them, Judge.  And that's when it becomes not -- that's when it

21  becomes ambiguous.

22         THE COURT:  So you don't try it?

23         MR. WATKINS:  Yes, we don't try it.  Until -- until

24  we find out that the phone is locked with an alpha numeric

25  code, and then we're left with no options because the lab told

 1    us that they cannot Bruteforce this.

 2          So then we go back and we watch the video.  And when

 3    he yelled this, it might be for his bank account, it might be

 4    for his phone, but let's try it.

 5          THE COURT:  No, no.  It's clear that it's for his

 6    phone.  It's clear he's telling you it's for his phone.

 7          MR. WATKINS:  I don't agree, but it's your decision,

 8    Judge.

 9          THE COURT:  Yeah, I understand that.

10          Go ahead.

11          MS. BENZ:  I mean, I don't know what to say.  I

12    don't.

13          THE COURT:  What's a Chime?  What's a Chime?

14          MS. BENZ:  A Chime account is his bank account,

15    Your Honor.  They are talking about -- at the time this

16    conversation is taking place, Juan is telling the agents I'm

17    not a drug dealer, I have money, I have $8,000 from my

18    unemployment, I can show it to you --

19          THE COURT:  No, I understand that.

20          MS. BENZ:  -- from my Chime account.  Chime is --

21    it's an --

22          MS. KUBIAK:  Online bank.

23          MS. BENZ:  -- it's an online bank.  I actually have

24    an account because my baby-sitter wanted me to get one, I can

25    easily transfer money to her.

1          But there's an app, a Chime account app.  It's like

2     an M&T Bank app that's on your cell phone.

3          And so what was Juan was saying to the agents was if

4     you bring me my phone, the code to my phone is this, and I can

5     access my Chime account to show you the money on my phone.

6          THE COURT:  Okay.  And you're telling me that these

7     sophisticated IT people don't know what a Chime account is?

8          MR. ANTOINE:  Your Honor, may I?

9          THE COURT:  Yeah, go ahead.

10          MR. ANTOINE:  The decision that the experts at the

11     lab made -- obviously, it's easy now to go back and say they

12     should have done X, Y, Z.

13          THE COURT:  Can you answer my question first?

14          MR. ANTOINE:  Sure.

15          THE COURT:  Do these sophisticated IT people who are

16     working for the government not know what a -- I didn't know

17     what a Chime account was.  Do these sophisticated IT people

18     not know what a Chime account is?

19          MR. ANTOINE:  Judge, I can't speak for them, but I

20     know I didn't know what a Chime account was either.

21          MS. BENZ:  I can tell you that Agent Wizniewski knew,

22     because in the transcript Juan says, Chime.

23          And Agent Wizniewski responds, Chime?  Okay, got you.

24     Chime.  That, I've heard of.

25          THE COURT:  Okay.  Go ahead.  Now go ahead.  Now go

1    ahead.  Finish your argument.

2         MR. ANTOINE:  Thank you for the opportunity to be

3    heard, Your Honor.

4         What I wanted to say is it's -- it was the expert's

5    decision to try and submit this to a machine, because they

6    think it's the safest way without the possibility of erasing

7    data from the phone to try and get information out of it,

8    because they're not certain exactly as to the colloquy in the

9    video, that was their decision to make.

10        The other thing, too, Judge, is this the defendant's

11   cell phone.  It's his cell phone.  He knows what's in the cell

12   phone better than I do, better than Your Honor does, better

13   than anybody does.  And so if anybody knows exactly what's on

14   the phone to prepare for trial, it's that side.  There's no

15   possibility --

16        THE COURT:  Do you know what the text messages are on

17   your cell phone now?

18        MR. ANTOINE:  Your Honor, I can certainly tell you

19   without a doubt that I don't have pictures of porn on my

20   phone, I don't have pictures of cocaine on my phone, I don't

21   have pictures of guns on my phone, I don't have pictures of

22   coded language about deliveries of drugs on my phone.  I can

23   tell you that without -- without -- with a 100 percent

24   certainty.  And when you're faced with trial --

25        THE COURT:  Can you tell me what's on your phone

```
 1    though?  Now, you told me what's not on your phone --

 2              MR. ANTOINE:  Yeah.

 3              THE COURT:  -- and I can probably tell you things

 4    that are not on my phone, too.

 5              MR. ANTOINE:  Absolutely.  So if I'm faced -- if I'm

 6    charged --

 7              THE COURT:  Wait a minute, wait a minute.  But you

 8    can tell me what's on your phone?

 9              MR. ANTOINE:  Well, Your Honor, I have a lot of

10    things on my phone.  Can I tell you -- you're asking me if I

11    know every single item and every single text and everything

12    that I've ever sent?

13              THE COURT:  Right.

14              MR. ANTOINE:  Well --

15              THE COURT:  That you sent last week?  Can you tell me

16    the language of a text that you sent last week?

17              MR. ANTOINE:  Well, so, what's important and what's

18    relevant here, Judge, is if I'm -- if I'm charged with a

19    case --

20              THE COURT:  Right.

21              MR. ANTOINE:  -- that involves, I don't know, drug

22    conspiracy --

23              THE COURT:  Right.

24              MR. ANTOINE:  -- I would certainly be mindful of

25    anything that involves -- that might impact the case on my
```

1  phone.

2          THE COURT:  But you're not -- you're not gonna --

3          MR. ANTOINE:  No doubt it.

4          THE COURT:  You're not going to know the details, and

5  counsel needs to know the details.

6          MR. ANTOINE:  Absolutely, Your Honor.  Pictures of

7  guns, pictures of drugs.  I would certainly know about that,

8  Your Honor, and I would most certainly tell my counsel about

9  it, Judge.

10         MR. WATKINS:  A deleted message.

11         MS. KUBIAK:  Judge, they are impugning our -- we have

12 the defense, we are presumed innocent as we sit here.

13         THE COURT:  I understand.  I understand.

14         MS. KUBIAK:  And they're telling us their failures

15 are our fault, and we have an obligation to -- we don't even

16 have access to the phone.

17         THE COURT:  I got it.

18         MS. KUBIAK:  They have it in Virginia.

19         THE COURT:  I got it.

20         MS. KUBIAK:  We haven't even seen it.

21         THE COURT:  Enough --

22         MS. KUBIAK:  Well, we saw --

23         THE COURT:  -- argument.

24         MS. KUBIAK:  -- it yesterday.

25         THE COURT:  Enough argument.

1         You're not getting into his phone.  That -- that --

2  that is -- that's beyond -- the fact that you have IT people

3  that wouldn't do what is incredibly obvious to me, and that is

4  plug in a code that he clearly is telling you is the code for

5  this phone.  And if you plug it in and it says it's wrong, and

6  you plug it in a few times and you get the warning that says

7  if do you one more you're going to be locked out, okay, then

8  you stop.  Then you stop.

9         But not even trying it?  No.  No.  No.  That's not --

10  that's beyond the pale.

11         MR. ANTOINE:  Your Honor, may I know what exactly the

12  prejudice is in this case?

13         THE COURT:  The prejudice is that they got the

14  extraction from the defendant's cell phone a week before they

15  were supposed to go to trial from his cell phone, with bad

16  stuff in it that you want to put in a week before they're

17  going to trial.

18         You know, the -- the -- the -- I've allowed late

19  filings when there are -- when there's reason for the late

20  filing.  I understand that.

21         I understand your argument that, look it, when we

22  start prepping for trial, we prep for trial, and things come

23  up.  And I was a trial lawyer for a long time, and I get those

24  kinds of things.  And I have sympathy for lawyers who are in

25  the -- in the last minute preparation for trial finding

1   things, and then they turn it over to the other side, and the

2   other side says it's too late.  Okay.  That kind of stuff, I'm

3   okay with, I'll forgive.

4        But when you have something as important to a case as

5   the defendant's cell phone, and you have the code to get into

6   the phone, and you sit on that for two years, and then you

7   give it to the defense a week before, that's beyond the pale,

8   and that's not coming in.

9        MR. WATKINS:  Judge, may I be heard?

10       THE COURT:  You can say --

11       MR. WATKINS:  I'm not gonna -- I'm not gonna --

12       THE COURT:  -- you can make whatever record you want.

13   Make the record.

14       MR. WATKINS:  I'm not making a record, Judge, just --

15   I have a request.

16       THE COURT:  Go ahead.

17       MR. WATKINS:  There are two things that came from

18   that phone that they knew about before we gave them that

19   phone: the text message exchange between Mr. Padua and his

20   codefendant, and the parcel that was delivered on July 1st

21   that Your Honor said we didn't know enough about because --

22   you wouldn't let it in because we didn't know enough about it.

23       We have a picture of that parcel extracted from

24   Mr. Padua's phone with the address, the name, the name for

25   where it came from, everything that was on that receipt that

1  you wouldn't let in is on that parcel.  And I would request

2  that we'd be allowed to show those two things to the jury,

3  because --

4       THE COURT:  From his phone?

5       MR. WATKINS:  It's from his phone.

6       THE COURT:  No.  No.  No.  You're not showing

7  anything from his phone.  You're not showing any extractions

8  from his phone, you're not showing anything from his phone.

9       MR. ANTOINE:  Well, the last ruling that Your Honor

10  made is that we wouldn't be able to elicit that testimony from

11  even our agents about it because we didn't know enough about

12  the package.  But we now know enough about it.  Can we elicit

13  that information from our agent that, in fact, this package

14  was received at Mr. Padua's residence a month before?  Because

15  we now know all the information that the Court was asking us

16  about the last time.

17       MS. KUBIAK:  And it's the same situation, Judge.

18  It's just they -- you make a ruling, and they just keep

19  asking, and asking, and asking, until they get the answer that

20  they want.  And it's the same situation.

21       They didn't have it.  We had oral argument on this.

22  And then they go back and, after oral argument, because of

23  what we're arguing in court, they then go get more

24  incriminating evidence.  It puts us in a very difficult

25  position to defend Mr. Padua and make oral arguments and

1  representations to this Court based upon what's been filed.

2  And they basically took what we said, and then utilized it to

3  our disadvantage.  How are we supposed to litigate and defend

4  our client when we're making representations to the Court, and

5  they go back and then say, oh, hey, by the way, we missed

6  this, let's go grab this, and now we should be able to use it.

7        MR. ANTOINE:  Judge, by way of context, the agent --

8  what we have is information of a package that was received at

9  Mr. Padua's residence approximately a month before this

10 incident that he's on trial for now.  We wanted to elicit

11 that, and we said it's 404(b) evidence.

12       Your Honor asked us specifically, well, what do you

13 know about this package?  How much does it weigh?  Where did

14 it come from?

15       A lot of this information we didn't have at the time.

16 And because of insufficiency of information about that

17 package, Your Honor said, well, I'm not going to let your

18 agent testify to that.

19       We now --

20       THE COURT:  Now you have the information from the

21 phone?

22       MR. ANTOINE:  Now we know everything about it.

23       THE COURT:  No.  Not if it's from the phone.  No.

24       If it's from the phone, no, you should have had that

25 two years ago, or however long ago you had --

1              When did that interview take place?

2              MS. BENZ:  15 months ago.

3              THE COURT:  15 months ago.

4              So you had that 15 months ago.  You could have gotten

5      it 15 months ago.  If you had it 15 months ago, you could have

6      made the argument to me two weeks ago, and I would have let

7      you get it in.

8              No.  Not now.  It's too late.  It's too late.

9              I've forgiven late disclosures.  And the defense

10     tells me this happens in lots of cases, and there's never any

11     consequences.

12             And the government's attitude that these rulings that

13     Judge Roemer made are suggestive or -- or aspirational and not

14     rulings troubles me a great deal.  And the government has

15     acknowledged that it was poor language, saying they were just

16     suggestions and not rulings.  But that seems to be the

17     government's attitude.

18             And so as late as we -- you know, we're not under an

19     obligation.  The government -- and, again, this is not

20     directed toward your office at all or, heaven forbid, the two

21     of you.  I'm not impugning your integrity in the least.  What

22     I'm saying is the government has an obligation when they get

23     something like this to do their due diligence appropriately

24     and to give the defense what it should have in a timely

25     fashion.

1          Sometimes those things don't get done because of what

2   you told me about the codefendant's phone, and I say, okay, I

3   get it.  That -- that -- you tried, you tried, you tried, you

4   tried, you tried.  You got it when you got it, you turned it

5   over as soon as you got it, or -- you should have gotten it

6   two months ago but you got it two months later, you turned it

7   over as soon as your office got it.  I'm okay with that.

8          This is different in kind.  This is different because

9   the government, again, with a capital G, had all it needed to

10  get into this phone 15 months ago, and it didn't.

11         There's got to be a consequence for that, and this is

12  the consequence.

13         So, end of story.  Ruling's been made.  Not going to

14  revisit it.  You can make whatever record you'd like, and --

15  but that's my ruling.

16         MR. WATKINS:  Yes, Your Honor.

17         THE COURT:  Okay.  Anything else we need to do this

18  morning?

19         MS. KUBIAK:  Judge, I just have -- they -- the

20  government submitted a redacted indictment removing

21  Mr. Vasquez from the entirety of the indictment.  I'd ask for

22  the language, also, known and unknown conspirators, to also be

23  redacted.  There were no other known or unknown conspirators

24  presented to the grand jury other than Mr. Vasquez, and I

25  think it calls for improper speculation with respect to having

1    that language in there.

2        THE COURT:  Well, you have to conspire with someone,

3    so they've got to be either known or unknown.  So, no, that

4    language will stay in.

5        The together, the language said together, and with

6    others known and unknown.  The together comes out because it

7    doesn't make sense anymore, together.  Because it used to say

8    Vasquez and Padua, together, and with others known and

9    unknown.

10       MR. WATKINS:  Yes, I will redact that out, I missed

11   it, Your Honor.

12       THE COURT:  Yeah, and it's an easy thing to miss.

13   But the with others known and unknown, no, that -- that --

14   that's just what -- it's by definition what a conspiracy is.

15   So, no, that stays in.

16       MS. KUBIAK:  I just know that Judge Wolford had done

17   that in the past, so that would be my request, Judge.

18       THE COURT:  Okay.

19       MS. BENZ:  Your Honor, there is an agreed-upon joint

20   statement of the case.  However, we just agreed to the last

21   little detail of it right before court, so I will send it over

22   right after court.

23       THE COURT:  Terrific.

24       MR. ANTOINE:  We will also be submitting jury

25   instructions, Judge, for aiding and abetting.

```
 1                THE COURT:  Okay.

 2                MR. ANTOINE:  I'll make sure that gets submitted

 3   today, as well.

 4                THE COURT:  Terrific.

 5                MS. KUBIAK:  And I'll need an opportunity to respond.

 6                THE COURT:  To the aiding and abetting?

 7                MS. KUBIAK:  Depending on what their instruction is.

 8                THE COURT:  Of course, oh, yeah, yeah, yeah.  Of

 9   course.  I just wanted to know whether aiding and abetting is

10   in the case, because it may affect our -- my preliminary

11   instruction to the jury.

12                With respect to the final instructions, we're going

13   to have a conference, as I said.  I mean, you folks should

14   have the final jury charge, the proposed final jury charge

15   early next week, and we will have a conference sometime next

16   week.

17                Okay.  Anything else?

18                MR. WATKINS:  Yes, Your Honor, I don't know -- and if

19   the Court has ruled on it, I apologize, but we -- I spoke with

20   Ms. Benz about it this morning, the government filed a motion

21   requesting that the Court take judicial notice of the

22   conversion of UTC time to Eastern Standard Time.

23                And -- and that -- that the Court acknowledge that

24   the testimony of Ms. Christine Siedsma is not an expert

25   testimony, but that she is a fact witness.
```

USA v Juan Padua - Status Conference - 10/27/21

40

```
 1              And I believe defense replied to it, responded to it,

 2    but we had --

 3              THE COURT:  Yeah, defense said why do you need me to

 4    take judicial notice of it?  Why can't she testify to that?

 5              MS. KUBIAK:  Which is exactly what they indicated she

 6    would testify to.

 7              THE COURT:  Right.

 8              MR. WATKINS:  She can testify to it, Judge.

 9              THE COURT:  Yeah, I don't see any reason for the

10    Court to take judicial notice of it.  I mean, I suppose I can,

11    but she can testify to that, it is what it is.

12              MR. WATKINS:  Very well, Judge.

13              THE COURT:  Okay.  Anything else?

14              MR. WATKINS:  No, Your Honor.

15              THE COURT:  Anything else from the defense?

16              MS. BENZ:  No, Your Honor, thank you.

17              THE COURT:  Okay.  See you tomorrow morning.

18              THE CLERK:  All rise.

19              (Proceedings concluded at 10:14 a.m.)

20              *    *    *    *    *    *    *

21

22

23

24

25
```

1

2                        **CERTIFICATE OF REPORTER**

3

4                In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on October 27, 2021.

8

9

10                        s/ Ann M. Sawyer
                          Ann M. Sawyer, FCRR, RPR, CRR,
11                        NYRCR, NYACR, Notary Public
                          Official Court Reporter
12                        U.S.D.C., W.D.N.Y.

13

14

15

16

17

18

19

20

21

22

23

24

25